## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TONIA OLIVER,                          :
                                       :
            Plaintiff,                  :
                                       :
      v.                               :        3:14-CV-00549
                                       :        (JUDGE MARIANI)
                                       :
SCRANTON MATERIALS, INC.               :
/aka/dba/                              :
THE H & K GROUP,                       :
                                       :
            Defendant.                  :

**FILED**
**SCRANTON**

JUN 1 4 2016

Per_____
DEPUTY CLERK

### MEMORANDUM OPINION

Before the Court is Defendant's Motion For Summary Judgment. (Doc. 32). For the reasons set forth below, the Court will deny the Motion.

## I.  INTRODUCTION AND PROCEDURAL HISTORY

On May 11, 2012, Plaintiff Tonia Oliver ("Oliver") filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") against Defendant Scranton Materials, Inc. ("SMI"). The charge asserted that Plaintiff "was notified [on] December 8, 2011, following a period of maternity/disability leave that she would be permanently laid off from her position effective January 2, 2012." (Docs. 32-1, at 129; Doc. 34-2, at 3). Plaintiff alleged discrimination on the basis of gender, pregnancy, and disability. (*Id.*). The EEOC responded on July 2, 2012, notifying Plaintiff that it had "docketed this matter as a charge." (Doc. 34-2, at 5). Thereafter, the EEOC issued a notice of right to sue letter dated December 19, 2013.

On March 24, 2014, Plaintiff filed a Complaint in this Court against SMI. (Doc. 1). The Complaint asserts three counts. Count I alleges that the Defendant engaged in unlawful employment practices on the basis of sex in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et seq.*, "by subjecting plaintiff to a hostile and discriminatory work environment on the basis of sex and pregnancy." (*Id.* at ¶ 23). Count II alleges that following the Plaintiff's complaint to Marci Kirkpatrick in Defendant's human resources department concerning the hostile work environment, harassment and discrimination she suffered on the basis of her sex and pregnancy, that the Defendant retaliated against her by "cutting her out of meetings on the 'U Project', complaining of her need for pregnancy related leave, and asking her to accept a salary reduction due to her pregnancy and need for leave." (*Id.* at ¶ 28). She further alleges she was retaliated against based on her disability—which related to complications with her pregnancy. Count III asserts a cause of action under Title I of Americans With Disabilities Amendments Act (the "ADAAA") based on the Defendant's alleged failure "to accommodate her need for disability leave because of complications of pregnancy and refusing to allow her to return to work." (*Id.* at ¶ 33).

On June 27, 2014, SMI moved to dismiss the Complaint for failure to state a claim. (Doc. 10). On March 5, 2015, this Court denied Defendant's Motion with respect to Count I and granted Defendant's Motion with respect to Counts II and III. (Doc. 24). Counts II and III were dismissed without prejudice and with leave to amend.

2

Plaintiff filed an Amended Complaint, (Doc. 28), on March 18, 2015. Defendant answered that Complaint on April 8, 2015. (Doc. 31). Then, on June 30, 2015, Defendant filed the instant Motion For Summary Judgment. (Doc. 32).

## II. STATEMENT OF FACTS

### A. Local Rule 56.1

In accordance with Local Rule 56.1,[1] Defendant submitted what it asserts to be a "Statement of Undisputed Material Facts" in support its Motion For Summary Judgment. (Doc. 32-1). Inexplicably, the Plaintiff failed to file a Response to Defendant's Statement of Material Facts.[2] Nonetheless, this Circuit has made clear that a district court may not

---

[1] Local Rule 56.1 provides:

> A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

> A statement of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

> All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

[2] Plaintiff did file an unnecessary response to Defendant's Motion For Summary Judgment (Doc. 34-1). This document responds to the paragraphs of Defendant's Motion and, in doing so, on a number of occasions responds by referring the Defendant to "Plaintiff's Response to Defendant's Statement of Undisputed Facts." *See, e.g.,* paragraphs 1 through 5, 8-9, 15-18, 32-34, 40-43, 45-48, 53, 64-66, 68-69, 77-78 and 87. Yet, Plaintiff never filed a response to the Defendant's Statement of Undisputed Facts. This is so even though Defendant, in its Reply Brief, (Doc. 35), brought Plaintiff's failure to do so to her attention,

properly enter summary judgment solely on the basis of the non-moving party's failure to submit a response to the moving party's statement of material facts in violation of a local rule. *See generally Anchorage Assoc. v. Virgin Islands Bd. of Tax* Review, 922 F.2d 168 (3d Cir. 1990). Accordingly, the Court will review the Defendant's "Statement of Undisputed Material Facts" as well as the exhibits submitted by Plaintiff's in opposition to Defendant's Motion For Summary Judgment to determine whether summary judgment is appropriate under the circumstances.

## B. Plaintiff's Employment With Defendant SMI

Defendant SMI "was a company that produced and sold natural stone products, such as decorative landscape stone and building stone, for wholesale delivery."[3] (Doc. 32-1 at ¶ 1). On March 8, 2010, SMI hired Plaintiff Oliver "in a sales capacity." (*Id.* at ¶ 2). Defendants assert that the nature of SMI's business was such that there was little need for a full-time sales staff during the winter months and, as a result, "it was agreed that Plaintiff would be employed during the company's 'peak season,' (the months between March 1 and October

---

stating "Plaintiff does not assert or advocate that any of the testimony cited by Defendant is inaccurate and, notably, Plaintiff never filed a response to Defendant's Statement of Facts – which, in and of itself, demands that the Court deem them admitted. (*Id.* at 1).

Plaintiff's Sur-Reply Brief (Doc. 38) avoids any reference to Plaintiff's failure to file a Response to Defendant's Statement of Material Facts and offers no excuse for not doing so. Plaintiff's failure to submit a Response to the Statement of Material Facts is a failure of representation unexcused by anything in the Record.

[3] In the caption of her Amended Complaint, Plaintiff refers to SMI as "/aka/ /dba/ 'The H&K Group' 819 Newtown Road Scranton, PA 18504." (Doc. 28). Plaintiff's declaration stated that her business card indicated that she worked for the "H & K Group" and her e-mail address was Toliver@hkgroup.com (Doc. 34-2, at 62). According to Defendant, "[t]he 'H&K Group' is not a legal business entity and is, rather, a service mark." (Doc. 32-1 at ¶1 n.1).

4

31 at a salary of $50,000)." (*Id.* at ¶ 4). After this "peak season," it was expected that Plaintiff would be laid off during the "off season." (*Id.* at ¶ 5). However, during Oliver's first year of employment, the Defendant secured a contract to perform work on behalf of the University of Scranton which enabled Defendant to have work available to permit Oliver to remain employed throughout the 2010-2011 "off season." (*Id.* at ¶¶ 7, 8).

In March of 2011 Plaintiff became pregnant with triplets. (Doc. 34-2, at 30). Starting in June 2011, certain complications with the pregnancy required Plaintiff to begin working half-days. In accordance with Defendant's policy, as explained to Ms. Oliver by Marci Kirkpatrick, Plaintiff was nevertheless paid full-time. (Doc. 34-3, at 40). It was at this point that Plaintiff began having "problems" with SMI part-owner and supervisor John Scarantino. Specifically, she testified that Mr. Scarantino "was great with my pregnancy until it affected my work. And it affected my work in the manner that I had to go on half days at one point. And at that point, things changed." (Doc. 34-2, at 29-30). She further testified that "after the corporate owners found out about my pregnancy, things got very, very ugly."[4] (*Id.* at 34).

In addition, Plaintiff Oliver testified that her half-days at SMI became the subject of a meeting held on June 29, 2011, in which Jim Haines, Tom Letwinch, Tracy Lignore and Ken Smith were present and discussed her medical condition. After the meeting was over, John Scarantino walked over to Plaintiff's desk and told her "that meeting was about you." (*Id.* at

---

[4] Ms. Oliver further testified that she "had a lot of problems during [her] pregnancy." (Doc. 34-2, at 55). In particular, she had severe back pain, known as "lumbar lordosis," and carpal tunnel syndrome. (*Id.* at 55). She further testified that she was also unable to eat and sleep, and had terrible headaches as a result of her pregnancy. (*Id.* at 56).

38-39). He also told Plaintiff that "you're not going to be able to work with those three fucking babies at home."[5] (*Id.* at 44). Oliver was left with the impression that the corporate owners "obviously came down very hard on John Scarantino and John Scarantino came down hard on me." (*Id.* at 104:12-15). Plaintiff was also informed by Scarantino that the attendees at the meeting wanted to know if she would take half of her salary (since she was only working half of the time), but she refused. Ms. Oliver continued to receive full salary for working half days until she went out on maternity disability leave on July 25, 2011, as a result of complications from her pregnancy. (*Id.* at 39-40).

When asked whether she could identify any other facts demonstrating that the corporate ownership's attitude changed toward her after they learned she was pregnant, Oliver answered: "Well I was no longer included in meetings that I once set up. I was given busy work. Like now, I went from heading and taking care of and running the entire project to literally taking pictures and billing. That was it. Like literally that's the only thing I did." (*Id.* at 40-41). She referred to this treatment as a "punishment" and further noted that "on more than one occasion" she was told that the company was not "sure how I was going to be able to work with three babies at home." (*Id.*). She also testified that at this point:

> From the time I went on half days until the time I went out completely, there was not a comfortable moment at Scranton Materials when I was there. I mean, there was a time that I walked into [Mr. Scarantino's] office at 11 o'clock in the morning, and I literally said to him, hey I'm heading out here soon. I said, is there anything you

---

[5] Plaintiff also testified to other statements made by Mr. Scarantino regarding her pregnancy and childbirth in mid-June 2011, which primarily concern her inability to work with newborn triplets at home. (*Id.* at 123).

need? Now I'm on half days. And he says to me, it's 11 o'clock. And I said yeah – he said it's only 11 o'clock. And I said, I understand that. I said, I'm only here until noon. And he said, well, you should fucking go now. And he spins his chair around and puts his back to me. That's not comfortable. That's not nice. You don't talk to people or treat people like that. Again, showing again that I was on a half day status.

(*Id.* at 44-45). When asked if these statements were because of her pregnancy or because of her half-day status, she testified "I believe it was because I was on half day status, because I was pregnant." (*Id.* at 46).

On October 11, 2011, Plaintiff gave birth to triplets, (Doc. 32 at ¶ 37), and her FMLA leave expired on or about October 17, 2011. (*Id.* at ¶ 39 n.5). Plaintiff believed she was going to return to work in December 2011. However, on December 6, 2011, she sent an e-mail to Defendant requesting an additional four weeks leave due to complications related to her pregnancy and associated surgery. The e-mail further indicated that she intended to return to work with no restrictions as of January 2, 2012. Just two days later, Mr. Scarantino informed Plaintiff that her employment would be terminated the following month. (Doc. 34-2 at 21-22).

### C. Defendant's Rationale For Terminating Plaintiff

According to Defendant SMI, in the late summer and early fall of 2011, SMI began marketing itself for sale to third parties. John Scarantino, a partial owner of SMI, met with representatives from a company called Meshoppen Stone to discuss its interest in purchasing SMI. (Doc. 32-1 at ¶¶ 13, 14). According to Defendant, in preparation for its sale, SMI laid off four of its seventeen remaining employees between September 2011

7

through November 2011, leaving Plaintiff, John Scarantino, and four additional employees.[6] (*Id.* at ¶ 17).

According to Defendant, in the fall/early winter of 2011 SMI reached an agreement in principle with Meshoppen Stone.  Specifically, in support of its Motion for Summary Judgment Defendants submitted the Declaration of James T. Haines, the former Corporate Director of Defendant SMI.  (Doc. 32-1, at 84-86).  Mr. Haines avers that in anticipation of the finalization of the sale of the business as well as the "overall lack of business during the winter months," he made the decision to lay off SMI's one remaining office employee and one of its sales employees.  (*Id.* at ¶¶ 19, 20).  Thus, on December 8, 2011, Mr. Scarantino informed Oliver that she would be permanently laid off from SMI, effective January 2, 2012.  (*Id.* at ¶ 23).  Mr. Scarantino told Oliver that the reason she was being laid off was that the company was being sold.  In recalling this conversation, Ms. Oliver testified that Mr. Scarantino "said something along the lines of they screwed him. They were selling out their half to Meshoppen, that they laid everyone off, that he has no control anymore. Something along that line."  (*Id.* at ¶ 24).

The sale of Defendant SMI to Meshoppen Stone was finalized on March 17, 2012.  (*Id.* at ¶ 25).  Mr. Haines avers that as a result of the sale Defendant SMI "ceased business operations" and laid off "all eleven remaining employees of SMI and the company ceased its business operations on that date."  (*Id.* at 86).  He further asserts that his "decision to lay

---

[6] Defendant SMI also employed seven individuals in a manual labor/rock picking capacity. (*Id.* at ¶ 18).

Plaintiff off had nothing to do with her pregnancy, to the contrary, the decision was solely because the company was being sold and SMI would not be conducting any business following the close of the deal with Meshoppen Stone." (*Id*.).

Plaintiff disputes many of the facts surrounding the sale of Defendant SMI. (Docs. 36, 38). Specifically, along with her sur-reply, Plaintiff submitted a print out from the Pennsylvania Secretary of State's website which identifies Defendant SMI as the "Prior Name" of an "Active" Pennsylvania "Close Corporation" whose "Current Name" is "Scranton Crushed Stone, Inc." (Doc. 36, at 9-10). Mr. Haines is identified as the President of "Scranton Crushed Stone, Inc." and John R. Kibblehouse is identified as the Secretary and Treasurer. (*Id*.). Plaintiff also submitted a declaration in opposition to Defendant's Motion For Summary Judgment, averring that "[c]ontrary to what the defendant presents, Scranton Materials continues its business today and has been in continuous business since before 2012," and "did not cease operations in 2012."[7] (Doc. 34-2, at 62-63). In addition, the declaration provides that "[s]ince Scranton Materials has continued to exist at the same location as when I worked there, in the same line of business and with the same operating telephone and fax numbers,  it could have brought me back to work in January 2012 when I was cleared to return, but it did not." (*Id*. at 63).

---

[7] Plaintiff also submitted excerpts from an agreement entitled "Agreement Between Meshoppen Stone, Inc. and Scranton Materials, Inc., and West Mountain Sand, Stone and Aggregates Ltd. For the Purchase of Certain Assets." (Doc. 34-2, at 90-91).  The document states that it is an "asset purchase agreement between Meshoppen Stone, Inc. and Scranton Materials, Inc. and West Mountain Sand, Stone & Aggregates Ltd., with Scranton Materials and West Mountain collectively referred to as the Seller." (*Id*.). Defendant presented no evidence, other than Mr. Haines' Declaration, demonstrating that the sale of Defendant SMI in fact took place.

## III.   STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party,

and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993). In employment discrimination cases, the Third Circuit has cautioned district courts that "[s]ummary judgment is to be used sparingly." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008)).

## IV. ANALYSIS

### A. Discrimination on the Basis of Sex and Pregnancy and Hostile Work Environment (Count I)

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This language "is not limited to 'economic' or 'tangible' discrimination" but also "includes requiring people to work in a discriminatory hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal citation and quotation marks omitted). Similarly, the Pregnancy Discrimination Act, which is codified within Title VII, provides that:

> [t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . .

42 U.S.C. § 2000(e)(k).

11

At the summary judgment stage, Plaintiff's discrimination claim is analyzed according to the familiar burden shifting approach laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.3d 668 (1973); *accord Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). "'[T]he plaintiff must first establish a prima facie case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. If the defendant does so, the presumption of intentional discrimination disappears, but the plaintiff can still prevail by showing that the employer's proffered reason is merely a pretext for discrimination.'" *Kessler v. AT & T*, No. 3:13-CV-00207, 2015 WL 5598866, at *4 (M.D. Pa. Sept. 22, 2015) (quoting *James v. Sutliff Saturn, Inc.*, 468 F. App'x 118, 120 (3d Cir. 2012)).

Defendant seeks summary judgment on Count I, asserting that: (1) "Plaintiff failed to produce evidence establishing a prima facie case for pregnancy discrimination," (Doc. 33, at 10-11); (2) even if Plaintiff established a prima facie case of pregnancy discrimination "the facts of record prove that Plaintiff's layoff was for legitimate, business reasons—namely, because SMI was sold to Meshoppen," (*Id.* at 13-14); and (3) "Plaintiff has failed to present any evidence, other than mere subjective conjecture, that her layoff was a pretext for discrimination." (*Id.* at 14-15). With respect to Plaintiff's hostile work environment claim asserted in Count I, Defendant maintains that summary judgment is appropriate because Plaintiff's claim is time-barred, (*Id.* at 15-16), and the claim fails as a matter of law because

Plaintiff's allegations "fall far short of the severe and pervasive harassment needed to sustain a hostile work environment claim." (*Id.* at 16-18).

### i.    Plaintiff's Prima Facie Case

In order to establish a prima facie case of pregnancy discrimination, a plaintiff must establish that: (1) the employer knew of her pregnancy; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) there is a causal nexus between her pregnancy and the adverse employment action. *Doe*, 527 F.3d at 358. Defendant asserts that Plaintiff failed to establish a prima facie case of pregnancy discrimination because there are no facts in the record establishing a causal nexus between her pregnancy and the adverse employment action. (Doc. 33, at 7-8). After reviewing the record, the Court disagrees.

As an initial matter, "[t]he Third Circuit has stated 'the elements of th[e] *prima facie* case must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.'" *Wilkie*, 2014 WL 4672489, at * 6 (quoting *Doe*, 527 F.3d at 365). And "the Supreme Court has cautioned that the *prima facie* requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" *Doe*, 527 F.3d at 365 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In the instant mater, Plaintiff testified that Mr. Scarantino made repeated comments to her concerning her pregnancy, including such statements as "you're not going to be able to work with three fucking babies at home." (Doc. 34-2, at 25-34 ).

Prior to her pregnancy Plaintiff recalled having no issues with Mr. Scarantino, but testified that things changed after her pregnancy. (*Id.* at 29-30). Specifically, Plaintiff testified that Mr. Scarantino "was great with my pregnancy until it affected my work. And it affected my work in the manner that, I had to go on half days at one point. And at that point things changed." (*Id.* at 30). Ms. Oliver further testified that "after the corporate owners found out about my pregnancy, things got very, very ugly. John Scarantino's attitude changed. Things he said to me were completely inappropriate. And at that point, I started fearing for the loss of my job." (*Id.* at 34-35). Construing the evidence in the light most favorable to the Plaintiff, as the Court must, and recognizing the light burden Plaintiff faces at this stage, the Court concludes that these alleged statements constitute sufficient evidence of discriminatory animus sufficient to satisfy Plaintiff's prima facie case of pregnancy discrimination.

### ii.   Pretext

Where, as here, the Plaintiff presents sufficient evidence to establish a prima facie case of employment discrimination, the burden shifts to the Defendant to articulate some "legitimate, nondiscriminatory reason" for the adverse employment action. *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998). To satisfy this burden, a Defendant must "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). There is no dispute that Defendant satisfied its burden to offer

a legitimate nondiscriminatory rationale for the adverse employment action—namely that SMI sold its business and ceased business operations.

Because Defendant offered a legitimate, non-discriminatory rationale for terminating Plaintiff, the burden now shifts back to Plaintiff to set forth facts tending to show that Defendant's proffered legitimate non-discriminatory rationale for her termination was merely a pretext for discrimination. Specifically, "the plaintiff must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

The Court believes that Plaintiff has proffered sufficient evidence from which a fact-finder could reasonably disbelieve the Defendant's articulated rationale for Plaintiff's termination. *First*, according to the Pennsylvania Secretary of State's Website, SMI did not in fact cease operations through a sale of the company's business. Rather, the Defendant merely changed its name from SMI to "Scranton Crushed Stone, Inc." (Doc. 36, at 9). *Second*, Plaintiff testified following the alleged sale of the business "there were other positions that I should have or could have been put in." (Doc. 34-2, at 33). *Finally*, Plaintiff avers in her declaration submitted in opposition to Defendant's motion for summary judgment that "[c]ontrary to what the defendant presents, Scranton Materials continues its business today and has been in continuous business since before 2012." (Doc. 34-2, at 62). Moreover, "[a]ccording to the current website, Scranton Materials continues to operate

at the same location on Newtown Road, and with the same telephone and fax numbers that

it had during my employment. I also note that when I enter the website address on the

business card that was issued directly to me, it continues to take me to the website for

Scranton Materials today. The company did not cease operations in 2012." (*Id.* at 62-63).

"Since Scranton Materials has continued to exist at the same location as when I worked

there, in the same line of business and with the same operating telephone and fax numbers

it, it could have brought me back to work in January 2012 when I was cleared to return, but

it did not." (*Id.* at 63).

Reviewing the evidence in the light most favorable to the Plaintiff, the Court finds that

there is a factual dispute regarding whether Defendant's proffered legitimate

nondiscriminatory rationale for Plaintiff's termination was a pretext for discrimination. Thus,

Plaintiff has presented sufficient evidence that Defendant's proffered rationale for

terminating her employment—that it went out of business—could be disbelieved by a

reasonable fact finder.

### iii.    Hostile Work Environment

To establish a claim for employment discrimination due to an intimidating or offensive

work environment, a plaintiff must show: (1) intentional discrimination; (2) "the

discrimination was pervasive and regular; (3) the discrimination detrimentally affected the

plaintiff; (4) the discrimination would detrimentally affect a reasonable person" in the same

position; "and (5) the existence of respondeat superior liability." *Aman v. Cort Furniture*

*Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). Defendant maintains that Plaintiff's hostile work environment claim must be dismissed because the facts do not show conduct that was severe and pervasive. Defendant further argues that Plaintiff's claim is untimely, because "Plaintiff failed to take any action regarding her purported hostile work environment claims— which she affirmatively confirmed ceased as of July 25, 2011." (Doc. 25, at 16 n.8). The Court rejects both arguments.

The Supreme Court has held that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. To determine whether a work environment is hostile, the Court must look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998) (internal citation and quotation marks omitted).

Here, Plaintiff has sufficiently demonstrated disputes of material fact such that a reasonable factfinder could conclude that the conduct she complains of was sufficiently severe and pervasive to constitute a hostile work environment.  In addition to statements made by Mr. Scarantino regarding Plaintiff's inability to work with three small babies at home, *see supra* Part IV(A)(i), Plaintiff testified that she was cut out of meetings and that meetings were held behind her back concerning her medical status.  (Doc. 34-2, at 32-48). She further testified that, as a result of her pregnancy and half-days, her job responsibilities were changed and diminished.  (*Id.*).  Moreover, Plaintiff's Declaration provides that she found Mr. Scarantino's "frequent comments regarding my pregnancy and my need for leave severe and unwelcome.  I complained to my doctor concerning the stress Scarantino's behavior and change in attitude was causing me and he encouraged me to go on leave." (Doc. 34-2, at 63).  Looking at the totality of the circumstances, and reviewing the evidence in the light most favorable to the Plaintiff, the Court finds that a reasonable factfinder could conclude that the claimed harassment was severe and pervasive and altered the conditions of Plaintiff's employment with Defendant SMI.

As for the timeliness of Plaintiff's claims, Plaintiff submitted a letter dated May 11, 2012, indicating that on that date she filed a charge with the EEOC (130 days after her January 2, 2012 termination).[8]  (Doc. 34-2, at 3).  The EEOC responded with a letter dated July 2,

---

[8] The letter is written by Plaintiff's counsel and provides, in relevant part:

> By way of this correspondence, Ms. Oliver files a charge of discrimination and retaliation against her former employer, Scranton Materials.  Specifically, Ms. Oliver was notified

2012, informing Plaintiff's counsel that Plaintiff's claim had been received and docketed, and further requested additional information in the form of a "verified charge." (*Id.* at 5). Because these letters indicate that the charge was filed "within three hundred days after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e-5(e)(1), the Court concludes that Plaintiff's hostile work environment claim is timely. *See Brenner v. Local 514, United Broth. Of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991) ("In most federal causes of action, when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."). Accordingly, Defendant's motion for summary judgment with respect to Count I is denied.

## B.     Retaliation (Count II)

Count II alleges that Defendant retaliated against Plaintiff in violation of Title VII and the ADAAA. Defendant seeks summary judgment on Count II, asserting that Plaintiff failed to engage in any protected activity under Title VII, (Doc. 33 at 19-20), and that the ADAAA claim similarly fails to allege any protected activity. (*Id.* at 21-22).

---

December 8, 2011 following a period of maternity/disability leave that she would be permanently laid off from her position effective January 2, 2012. She alleges discrimination on the basis of gender and pregnancy.

(Doc. 34-2, at 3).

### i.    ADA

Plaintiff's Amended Complaint also asserts a retaliation claim under the ADAAA, 42 U.S.C. § 12203.  The ADAAA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADAAA] or because such individual had made a charge" under the statute.  42 U.S.C. § 12203(a).  The statute further provides "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with an individual in the exercise or enjoyment . . . of any right granted or protected" by the ADAAA.  42 U.S.C. § 12203(b).

"In order to establish a prima facie case of retaliation . . . a plaintiff must show that: (1) she undertook some protected activity, (2) that she suffered an adverse employment action, and (3) that there exists a causal connection between the two."[9]  *Santee v. Lehigh Valley Health Network, Inc.*, Civil Action No. 13-3774, 2013 WL 6697865, at * 5 (E.D. Pa. Dec. 19, 2013) (citing *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004)).  After a plaintiff has established a prima facie case of retaliation, the *McDonnell Douglas* burden-shifting approach, *supra* Part IV(A)(2), is again applied.  *See Krouse v. Am. Sterilize Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997

Here, Defendants assert that Plaintiff failed to establish that she engaged in any protected activity under the ADAAA, and further maintain that, even if she did engage in

---

[9] "Unlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA, but only that the plaintiff has a 'reasonable, good faith believe that [she] was entitled to request the reasonable accommodation requested."  *Sulima v. Tobyhanna Arm Depot*, 602 F.3d 177, 188 (3d Cir. 2010).  "Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation."  *Id.*

such activity, she failed to establish a causal connection between the protected activity and

the adverse employment action.  The Court disagrees.  Again, viewing all the evidence in

the light most favorable to the Plaintiff, the Court concludes that a reasonable jury could find

that Ms. Oliver had a basis to seek an accommodation for her pregnancy related disability

on December 6, 2011, when she e-mailed Defendant requesting an additional four weeks

off.  Moreover, the factfinder could reasonably find that such request was causally

connected to her termination, which was just two days later.  *See Lauren W ex rel. v.

Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007) ("To establish the requisite causal connection

a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between

the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism

coupled with timing to establish a causal link.").  A mere two days between the protected

activity and the adverse employment action is an "unusually suggestive temporal proximity

between the protected activity and the alleged retaliatory action," *Id.*, such that Defendant's

motion for summary judgment must be denied.[10]  *See Palish v. K&K RX Servs., L.P.*, Civil

Action No. 13-cv-4092, 2014 WL 2692489, at *10 (E.D. Pa. June 13, 2014) (two weeks

temporal proximity between protected activity and termination "is sufficient to establish the

requisite causal link for purposes of the prima facie case").

---

[10] "Because the adverse employment actions alleged from this claim are the same as those alleged with respect to Plaintiff's discrimination claim, the Court will not repeat its analysis of *McDonnell Douglas* Steps Two and Three here. There remain disputes of fact as to whether the alleged incidents . . . were motivated by retaliatory intent." *Kessler*, 2015 WL 5598866, at * 14.

## ii.    Title VII

Title VII provides, in relevant part that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  In order to establish a *prima facie* case of retaliation under Title

VII, a plaintiff must tender evidence showing that: "(1) she engaged in activity protected by

Title VII; (2) the employer took an adverse employment action against her; and (3) there

was a causal connection between her participation in the protected activity and the adverse

employment action."  *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)

(quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  "If the employee

establishes his *prima facie* claim, the *McDonnell Douglas* approach applies, shifting the

burden to the employer to advance a legitimate, non-retaliatory reason for its conduct."

*James v. Tri-Way Metalworkers Inc.*, 3:13-CV-1638, 2016 WL 3035305, at *13 (M.D. Pa.

May 26, 2016) (citing *Moore*, 461 F.3d at 342)).  "If the employer provides such a reason,

the plaintiff must then 'be able to convince the factfinder both that the employer's proffered

explanation was false, and that retaliation was the real reason for the adverse employment

action.'"  *Id.* (quoting *Moore*, 461 F.3d at 342)).

Defendant seeks summary judgment, again asserting that Ms. Oliver failed to

engage in protected activity under Title VII.[11]  In contrast to Plaintiff's ADAAA retaliation

claim, the protected activity at issue concerns Plaintiff's discussions with Defendant's HR

personnel, Marci Kirkpatrick.  Ms. Oliver's declaration, submitted in opposition to the

Defendant's motion for summary judgment, provides that:

> To clarify my conversation with Marci Kirkpatrick, I specifically told Ms. Kirkpatrick
> that I was concerned that I would lose my job if I took leave because of my
> pregnancy.  I did not specifically tell her that John Scarantino made statements
> regarding my pregnancy or questioned 'how I would work with 'three f --- ing babies.'
> I kept this to myself because I was afraid for my job, and thought it would be futile to
> complain since Scarantino was my immediate supervisor day to day and Mr. Haines
> supervised work on the U project.  I did not believe that human resources could
> protect me from harassment by corporate owners like Scarantino and Jimmy Haines
> who were angry about my pregnancy and my need for leave.

(Doc. 34-2, at 63).  In addition, Ms. Kirkpatrick testified that she recalled a

conversation with Ms. Oliver in mid-year 2011 concerning Defendant SMI's maternity and

disability benefits and leave policies.  (Doc. 34-2, at 97-99).  The Court finds that there is a

genuine dispute of material fact as to whether Plaintiff engaged in protected activity under

Title VII, and whether there was a causal connection between that activity and her

termination such that summary judgment is improper at this stage.  And, as previously

discussed, there is a genuine dispute as to whether the excuse Defendant has offered to

---

[11] "With respect to protected activity, the anti-retaliation provision of Title VII protects those who
participate in certain Title VII proceedings (the participation clause) and those who oppose discrimination
made unlawful by Title VII (the opposition clause)." *Moore*, 461 F.3d at 341 (internal citation and quotation
marks omitted).  "Opposition to discrimination can take the form of informal protests of discriminatory
employment practices, including making complaints to management." *Id.* at 343.  "To determine if
retaliation plaintiff's sufficiently opposed discrimination, we look to the message being conveyed rather than
the means of conveyance." *Id.*

justify Plaintiff's termination—that it went out of business--is merely a pretext for retaliation. Accordingly, the Court will deny Defendant's motion for summary judgment with respect to Count II.

### C.    Discrimination Under the ADA (Count III)

In Count III Plaintiff asserts a claim for disability discrimination under the Americans With Disabilities Act ("ADA"), as amended by the ADAAA. "In analyzing discrimination claims brought under the ADA, courts apply the burden-shifting framework set forth by the Supreme Court in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Fleck v. Wilmac Corp.*, Civil Action No. 10-05562, 2012 WL 1033472, at *6 (E.D. Pa. Mar. 27, 2012).

### i.    Plaintiff's Prima Facie Case

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a *prima facie* claim of disability discrimination under the ADA, a plaintiff must establish that she: "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Santee v. Lehigh Valley Health Network, Inc.*, Civil Action No. 13-3774, 2013 WL 6697865, at * 4 (E.D. Pa. Dec. 19, 2013) (quoting *Turney v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006)). Defendant asserts that Count III fails

because Plaintiff failed to establish that she was "disabled" within the meaning of the statute. (Doc. 33 at 22-24).

The ADA provides that an individual is "disabled" when he or she suffers, among other things, "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). In 2008, Congress passed the ADAAA, which loosened the standards by which courts are to interpret the ADA's language and specifically provides that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* at § 12012(4)(A). Under the ADAAA, "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes" of the ADAAA. *Id.* at § 12012(4)(B). Congress' stated intent in passing the ADAAA included, among other things, "convey[ing] that the question of whether an individual's impairment is a disability under the ADA should not require extensive analysis" and that the then-existing standard that courts applied to the terms "substantially limits" had "created an inappropriately high level of limitation necessary to obtain coverage under the ADA." Pub. L. 110-325, 122 Stat. 3553, § 2(b)(5). Thus, the relevant regulations now provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 16030.2(j)(1)(i).

"The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." *Id.* at § 1630.2(j)(1)(iv). Moreover, "[t]he effects of

an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." at § 1630.2(j)(1)(ix). Thus, while pregnancy in and of itself may not constitute a disability under the ADA, *see Brennan v. Nat'l Tel. Directory Corp.*, 850 F. Supp. 331, 333 (E.D. Pa. 1994), courts interpreting the Act in light of the 2008 amendments have found that *complications arising out of pregnancy* can constitute disability sufficient to invoke the ADA. *See, e.g., Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 1-12-cv-0817-RLY-MJD, 2013 WL 121838, at **2-3 (S.D. Ind. Jan. 9, 2013); *Maayorga v. Alorica, Inc.*, No. 12-21578-CIV, 2012 WL 3043021, at *6 (S.D. Fla. July 25, 2012); *see also Darian v. Univ. of Massachusetts-Boston*, 980 F. Supp. 77, 85 (D. Mass. 1997) (pre-ADAAA case, noting that "[b]y its term, though pregnancy *per se* is not covered by the ADA, the Act does not necessarily exclude all pregnancy-related conditions and complications.").

The Court finds that, drawing all reasonable inferences in the light most favorable to the Plaintiff, a jury could conclude that Plaintiff was disabled within the meaning of the ADA due to complications related to her pregnancy. *See Young v. United Parcel Servs. Inc.*, __ U.S. __, 135 S.Ct. 1338 (2015) (vacating summary judgment order and holding that factual disputes precluded summary judgment in pregnant employee's action alleging employer had subjected her to pregnancy discrimination in violation of the ADA and Title VII, as amended by Pregnancy Discrimination Act). Evidence in the record supporting this finding includes the Plaintiff's testimony, declaration, as well as letters from her doctors concerning

her complications with her pregnancy.[12]  Moreover, Ms. Oliver's declaration notes the

"disabling effects of my pregnancy were not transient or minor.  This pregnancy was unlike

any of my previous ones.  The multiples pregnancy substantially limited by ability to sleep

and eat, among other things." (Doc. 34-2, at 63-64).  The Court further finds that there is

sufficient evidence from which a rationale factfinder could conclude that there was a causal

connection between Plaintiff's disability and her termination.  *See Kessler*, 2015 WL

5598866, at * 9 ("The weight and credibility to assign this testimony is a quintessential

question of fact for the jury.").  Thus, construing the record in the light most favorable to the

Plaintiff, the Court finds that a reasonable jury could determine that Plaintiff's termination

was causally connected to her disability.

### ii.    Defendant's Rebuttal and Pretext

Applying the *McDonnell Douglas* burden shifting framework, as the Court did with

respect to Counts I and II, the Court again concludes that there are genuine disputes of

material fact with respect to whether Defendant's proffered nondiscriminatory rationale for

Plaintiff's termination, that it was sold to a third party and ceased business operations, was

a pretext for discrimination.  *See supra* Part IV(A)(2).  Accordingly, Defendant's motion to

dismiss Count III is denied.

---

[12] Specifically, Ms. Oliver testified that during her more than seven month pregnancy, she did not
sleep, was placed on a liquid diet that substantially limited her ability to eat, and "had terrible carpal tunnels
for whatever reason.  It just made my hand – like it effects your nerves, and just presses on it and your
hands do whatever they want to do.  So that was the embarrassing part of it.  But, there were just a lot of
things, just walking, breathing, [and] eating.  I couldn't eat forever." (Doc. 34-2, at 54-56).  She further
testified about having terrible headaches, lower back pain called "lumbar lordosis," as well as a
hospitalization resulting in an emergency C section.   (*Id.*).

## V.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion For Summary Judgment is Denied.  A separate order follows.

Robert D. Mariani
United States District Judge